## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TRANSPORTATION CONSULTANTS, INC.**                          **CIVIL ACTION**

**VERSUS**                          **NO: 19-922**

**CHIQUITA FRESH NORTH AMERICA, L.L.C., ET AL**                          **SECTION "H"**

## ORDER AND REASONS

Before the Court are Plaintiff's Motion for Partial Summary Judgment (Doc. 27) and Defendants' Motion for Summary Judgment on the Inapplicability of the 90-Day Notice Provision (Doc. 25). For the following reasons, Plaintiff's Motion is **GRANTED IN PART**, and Defendants' Motion for Summary Judgment is **GRANTED IN PART**.

## BACKGROUND

This case arises out of a contractual dispute between Plaintiff, Transportation Consultants, Inc. ("TCI"), and Defendants, Chiquita Fresh North America, L.L.C.; Chiquita Brands, L.L.C.; and Chiquita Brands International, Inc. (collectively, "Chiquita"). TCI brings suit against Chiquita to recover for allegedly unpaid transportation services, and Chiquita brings a counterclaim against TCI for alleged damage to six sets of cargo that TCI handled.[1]

---

[1] Chiquita's also brings a counterclaim against TCI for alleged equipment damage.

On September 1, 2015, the parties executed a Container Drayage, Warehouse Services, and Container Depot Agreement ("the Agreement"). Through this Agreement, the parties agreed that TCI would provide "container drayage, warehousing and transloading services, and container depot services to Chiquita."[2] The Agreement lays out three categories of services to be provided by TCI: (1) "Container Drayage Services," (2) "Warehouse Services," and (3) "Container Depot Services." Relevant to the instant Motions are the first two categories of services. The "Container Drayage Services" provision provides:

> TCI will provide container drayage as requested by Chiquita or its Carriers pursuant to rates agreed upon herein and attached in Appendix B ("Rate Schedule"). TCI shall take all necessary safety and security precautions in handling and transportation to prevent damage, loss or theft. Additionally, TCI will ensure all loads drayed under this agreement will have the temperature set and maintained per the instructions on the Bill of Lading provided by Chiquita.[3]

The "Warehouse Services" provision provides:

> TCI agrees to provide *both transloading and warehousing services* to Chiquita or its Carriers . . . . Transloading services shall generally consist of transferring commodities from one container or trailer to another container or trailer provided by Chiquita or a third party at Chiquita's direction, applying temperature recorders to loads as necessary as instructed by Chiquita, and issuing Bills of Lading to drivers picking up the loads as provided by Chiquita. Additionally, TCI will ensure all loads transferred under this agreement will have the temperature set and maintained per the instructions on the Bill of Lading provided by Chiquita on both the original container pulled from the port and on the container or trailer to which the product is being transferred. . . . Warehousing services may consist of long term or short term storage of cargo, restacking, palletizing, labeling, and

---

[2] Doc. 27-6 at 1.
[3] *Id.* at 2.

picking and packing custom orders for shipment. . . .  In providing *such services*, TCI will be considered a warehouseman as described in Article 7 of the Uniform Commercial Code ("UCC"), and is entitled to all rights and subjects [sic] to all obligations described therein, *except as modified* by the agreed Standard Contract Terms and Conditions for Merchandise Warehousemen located in Appendix A.[4]

Appendix A provides, in pertinent part:

(a) Claims by the depositor and all other persons must be presented in writing to the warehouse within a reasonable time and in no event longer than either 90 days after delivery of the goods by the warehouseman or 90 days after depositor of record or the last known holder of a negotiable warehouse receipt is notified by the warehouseman that loss or injury to part or all of the goods has occurred, whichever time is shorter.
(b) No action may be maintained by the depositor or others against the warehouse for loss or injury to the goods stored unless timely written claim has been given as provided in paragraph (a) of this section and unless such action is commenced either within twelve months after date of delivery by warehouse or within nine months after depositor of record or the last known holder of a negotiable warehouse receipt is notified that loss or injury to part or all of the goods has occurred, whichever time is shorter.[5]

In its counterclaim against TCI, Chiquita seeks to recover for six instances of alleged cargo damage dating from February 5, 2016 to June 23, 2016 and totaling $83,090.42. In each of these instances, the cargo was allegedly damaged because the temperature was not properly maintained in the trailers.

TCI's Motion for Summary Judgment asks this Court to find that Chiquita's claims against it fail as a matter of law because Chiquita failed to file suit within twelve months of the date of loss and failed to satisfy the 90-day notice requirement as required under Appendix A to the Agreement. TCI

---

[4] *Id*. (emphasis added).
[5] *Id*. at 8.

also asserts that, even if this Court finds that Appendix A does not apply, Chiquita's claims nevertheless "sound in negligence and are thus subject to a one-year prescription period."[6] In opposition, Chiquita argues that (1) Appendix A is inapplicable in this context and that the 10-year prescription period for breach of contract should instead apply; (2) Louisiana law prohibits parties from contracting to make prescription more onerous, so even if Appendix A does apply, it is legally improper because it impermissibly shortens the prescriptive period; (3) TCI renounced the rights accrued to it through prescription by its own actions and words, rendering its prescription defense null; and (4) even if the claim for cargo damage is prescribed, Louisiana law nevertheless permits prescribed claims to be used as a defense to offset the main demand, so its claims for damages should be limited in this respect. Chiquita also asserts that it did comply with the 90-day notice requirement in a July 2016 email it sent to TCI.

Chiquita's Motion for Summary Judgment asks this Court to find that the 90-day notice provision in Appendix A is inapplicable to its counterclaims. Chiquita also asserts that, if this Court finds that the 90-day notice provision is applicable, it nevertheless complied with the requirement. TCI argues that the 90-day notice provision does apply and that Chiquita did not satisfy it.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7] "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will

---

[6] Doc. 27-3 at 6.
[7] FED. R. CIV. P. 56.

properly preclude the entry of summary judgment."[8] Nevertheless, a dispute about a material fact is "genuine" such that summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[9]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[10] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[11] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[12]

"In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial."[13] The Court does "not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[14] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[15]

---

[8]  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[9]  *Id*.

[10]  Coleman v. Hous. Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997).

[11]  Engstrom v. First Nat'l Bank, 47 F.3d 1459, 1462 (5th Cir. 1995).

[12]  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[13]  Johnson v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

[14]  Badon v. R J R Nabisco, Inc., 224 F.3d 382, 393–94 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).

[15]  Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

## LAW AND ANALYSIS

As an initial matter, the Court notes that there is a factual dispute regarding the type of service(s) performed by TCI when the alleged cargo damage occurred. TCI agreed to provide drayage, transloading, and warehouse services to Chiquita. TCI asserts that the "cargo claims at issue pertain to damage to bananas allegedly caused by incorrect temperature settings during the *transloading services* that TCI was providing to Chiquita."[16] Chiquita maintains, however, that the "cargo claims at issue involve damage to bananas caused by TCI while TCI was providing *drayage and transloading services*."[17] The parties agree that the cargo damage did not occur during TCI's warehousing services. Thus, the question remains whether the cargo damage occurred solely during TCI's transloading services, or if it also occurred during its transloading *and* drayage services. As will be explained more fully below, this distinction is critical. The Court will begin its analysis by determining the overall applicability of Appendix A to the claims at issue.

## I.     Applicability of Appendix A to Chiquita's Counterclaims

Chiquita argues that its claims for cargo damage are not prescribed under Appendix A because Appendix A only applies to TCI's warehousing services and the cargo damage occurred during TCI's drayage and transloading services. Chiquita emphasizes the fact that "references to drayage and transloading services are conspicuously absent from Appendix A."[18] Chiquita also argues that "[t]he fact that the description of transloading services is found in the section of the main agreement titled 'Warehouse Services'" does

---

[16] Doc. 27-2 at 1 (emphasis added).
[17] Doc. 28-15 at 1 (emphasis added).
[18] Doc. 28 at 11.

not expand the applicability of Appendix A to transloading services. This Court finds that Appendix A is applicable TCI's transloading and warehousing services but *not* its drayage services.

Louisiana law mandates that a contract be "read for its plain meaning."[19] "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[20] The contract at issue here, the Agreement, lays out three distinct categories of services: (1) container drayage services, (2) warehouse services, and (3) container depot services. The first provision—container drayage services—describes just TCI's drayage services and references only Appendix B for the agreed upon rates for such drayage services. This provision makes no mention whatsoever of Appendix A, and the parties do not dispute that Appendix A is therefore inapplicable to claims arising from TCI's drayage services.

The second provision, regarding warehouse services, however, describes two distinct sets of services: transloading *and* warehousing. This provision provides a definition for transloading and a separate definition for warehousing. Notably, this provision concludes with: "In providing *such services*, TCI . . . is entitled to all rights and subjects [sic] to all obligations . . . except as modified . . . in Appendix A."[21] The Court finds that the plain language of the contract mandates that Appendix A apply to TCI's transloading *and* warehousing services—not just TCI's warehousing services. If the parties intended for Appendix A to apply solely to TCI's warehousing services, then the contract would say precisely that, as the warehouse services

---

[19] In re Liljeberg Enters., Inc., 304 F.3d 410, 439 (5th Cir. 2002) (citing Nat'l Union Fire Ins. Co. v. Circle, Inc., 915 F.2d 986, 989 (5th Cir 1990) (per curiam)).
[20] LA. CIV. CODE ANN. art. 2046.
[21] Doc. 27-6 at 2 (emphasis added).

provision has no difficulty making clear delineations between the two types of services described therein. Instead, the warehouse services provision mandates that Appendix A apply to "such services"—in the plural form—immediately after referencing "transloading and warehousing services hereunder."[22]

The Court is not persuaded by Chiquita's argument that because Appendix A only uses warehousing terminology and is silent as to transloading, its application is limited to TCI's warehousing services. The relevant section of Appendix A, the section that provides for a 12-month prescriptive period and a 90-day notice requirement, is devoid of any language that would limit its application solely to warehousing services. Instead, the Court finds that the plain language of the warehousing provision in the Agreement speaks for itself: Appendix A applies to "such services" described in the warehousing provision. Those services are transloading *and* warehousing.

Accordingly, the Court holds that the limitations outlined in Appendix A are applicable to Chiquita's claims against TCI for cargo damage that resulted from TCI's warehousing and transloading services but not TCI's drayage services. As the Court has already noted, however, it is unclear which of the six instances of damage emanate from TCI's drayage activities and which emanate from TCI's transloading activities. Thus, to the extent that any of the cargo damage emanates from TCI's drayage services, Appendix A does not apply, and claims for damages based on drayage services are subject to a 10-year prescription period.[23] However, to the extent that any of the cargo damage

---

[22] *Id.*

[23] Breach of contract claims are personal actions and are therefore subject to a liberative prescription of ten years. LA. CIV. CODE ANN. art. 3499; Schenck v. Living Ctrs.-E., Inc., 917 F. Supp. 432, 435 (E.D. La. 1996) (distinguishing between an action for tort, which has a one-year prescription period, and an action for breach of contract, which has a ten-year prescription period).

emanates from TCI's transloading services, Appendix A does apply. The Court next addresses the legitimacy of the shortened prescription period contained in Appendix A and the effect it has on Chiquita's counterclaims.

## II.   Legitimacy of Appendix A's Twelve-Month Prescriptive Period

Chiquita next argues that the 12-month prescription period contained in Appendix A has no legal force in two respects. First, Chiquita argues that TCI renounced prescription in an email exchange from 2018, thereby rendering TCI's prescription defense null. Second, Chiquita argues that Louisiana prohibits parties from contracting to make prescription more onerous and that, by contracting for a shorter prescription period than what is provided law, the parties impermissibly made prescription more onerous.

### A. Renunciation of Prescription

Prescription may be renounced after it has accrued.[24] Renunciation may tacit or express.[25] "Renunciation of accrued prescription, to be effective, must be unequivocal and takes place only when the intent to renounce is clear, direct and absolute and manifested by words or actions of the party in whose favor prescription has run."[26] "[M]ere acknowledgment of a debt by the debtor does not operate as a renunciation of an acquired prescription."[27] Instead, "there must be a new promise made to pay the debt in order to nullify accrued prescription."[28] "A 'promise' means a declaration which gives to the person to

---

[24] LA. CIV. CODE ANN. art. 3449.

[25] *Id*. art. 3450.

[26] Bordelon's, Inc. v. Littell, 490 So. 2d 779, 781 (La. App. 3 Cir. 1986) (citing McPherson v. Roy, 390 So. 2d 543 (La. App. 3 Cir. 1980)).

[27] *Id*.

[28] *Id*.

whom it is made the right to expect or claim the performance of a specified act."[29]

Here, the six alleged instances of cargo damage occurred from February 2016 to July 2016. Chiquita points to an email written by TCI's president, Jeffrey Louis, to a Chiquita employee on April 30, 2018 and argues that this email was a renunciation of the prescription period contained in Appendix A that accrued in favor of TCI prior to the date of the email. The email states:

> You probably haven't received reimbursement because we have NEVER received any invoices. As you can see from the messages you sent me we were only "made aware" of 5 events on Wednesday, July 20, 2016 11:06 PM. Were we supposed to guess at a dollar amount? As we have just received an invoice regarding damages we will begin to process this internally.[30]

Chiquita argues that the last sentence constitutes a renunciation of prescription.

Committing to "begin to process" cargo damage claims could mean a number of things, and the email fails to specify what this "process" entails; Chiquita also fails to provide this Court with any clarifying evidence regarding TCI's "process." Indeed, the process could be a vetting process, whereby TCI first assesses the legitimacy of the damages claim to determine if it should even be paid. It could also be a process to initiate payment. However, without more, the Court cannot make a finding of the latter. The law is clear: the promise to repay must be unequivocal and cannot be a mere acknowledgment of a debt. This email is far from unequivocal and ambiguous at best. The Court, therefore, finds that this email does not constitute a new promise to pay the debt, and Chiquita's argument that TCI renounced prescription therefore fails.

---

[29] Weeks v. La. Patient's Comp. Fund, 858 So. 2d 851, 854 (La. App. 3 Cir. 2003) (citing Lima v. Schmidt, 595 So. 2d 624, 631 (La. 1992)).
[30] Doc. 28-4 at 2.

## B. Making Prescription More Onerous

Chiquita next argues that Louisiana law prohibits parties to a contract from making prescription more onerous and that shortening a prescription period from ten years to twelve months is "intolerably onerous" and should therefore be rendered null. It is well-settled that Louisiana law prohibits agreements that dispose of prescription or extend the period for prescription.[31] "A juridical act purporting to exclude prescription, to specify a longer period than that established by law, or to make the requirements of prescription more onerous, is null."[32]

Chiquita takes the position that a shortened prescription period is impermissibly onerous and therefore null. However, "the prohibition of requirements that make prescription more onerous means requirements that act to extend prescription and make it more onerous on the defendant [or cross-defendant]."[33] In fact, "Louisiana jurisprudence generally has allowed the parties contractually to shorten the prescriptive period."[34] Indeed, the Louisiana Supreme Court has stated that "[w]hile prescriptive periods may not be lengthened as a matter of public policy, such periods may be shortened upon agreement of the parties."[35] The Court finds this Louisiana Supreme Court majority opinion more persuasive than the Louisiana Supreme Court concurring opinion cited by Chiquita, which focused specifically on prescription periods in insurance policy contracts.[36] Accordingly, the Court finds that the

---

[31] LA. CIV. CODE ANN. art. 3471 cmt. b ("In Louisiana, the jurisprudence is well-settled that parties may not extend a period of prescription that is established by law.").

[32] *Id*. art. 3471.

[33] Sasol Wax Americas, Inc. v. Hayes/Dockside, Inc., No. 06-4790, 2008 WL 2067007, at *3 (E.D. La. May 14, 2008).

[34] *Id*. (citing La. Health Serv. & Indem. Co. v. McNamara, 561 So. 2d 712, 719 (La. 1990)).

[35] *McNamara*, 561 So. 2d at 719.

[36] Chiquita cites the concurring opinion of Justice Knoll in Taranto v. La. Citizens Prop. Ins. Corp., 62 So. 3d 721 (La. 2011), which states, "under the clear and explicit language of our Civil Code, parties to a contract cannot exclude prescription, nor can they extend or shorten

shortened prescription period contained in Appendix A is permissible and valid.

Therefore, Chiquita's counterclaims against TCI for cargo damage are subject to a twelve-month prescription period if they resulted from TCI's transloading services.[37] The six instances of cargo damage occurred in 2016, and the counterclaim was filed in July 2019—well after the twelve-month period provided for in Appendix A. Accordingly, to the extent that the six instances of cargo damage resulted from TCI's transloading services, they are prescribed on their face. Chiquita argues, however, that even if its claims for cargo damage are prescribed, Louisiana law nevertheless permits prescribed claims to be used as a defense to offset a main demand. The Court will next address this argument.

### III.   Using Prescribed Claims as an Offset to the Main Demand

The Louisiana Code of Civil Procedure provides that "a prescribed obligation arising under Louisiana law may be used as a defense if it is incidental to, or connected with, the obligation sought to be enforced by the plaintiff."[38] The question here, then, is whether Chiquita's claims for cargo damage are "incidental to, or connected with," TCI's claims for unpaid services. The Court finds that they are.

---

a prescribed period in the absence of a legislative provision directly allowing for such." *Id.* at 741 (Knoll, J., concurring). The majority opinion for the same case states, however, that "in a claim for breach of contract, the insurance contract is limited by the clear and unambiguous terms of the policy. . . . In the *absence* of a statutory prohibition, a clause in an insurance policy fixing a reasonable time to institute suit is valid." *Id.* at 728 (emphasis in original).

[37] To reiterate, any counterclaims for cargo damage resulting from TCI's drayage services are subject to the standard ten-year prescription period for breach of contract. It is unclear, however, which, if any, of the six instances of damage resulted from TCI's drayage services.

[38] LA. CODE CIV. PROC. ANN. art. 424.

Here, TCI seeks payment for services it allegedly performed for Chiquita under the Agreement, among other things.[39] Chiquita's counterclaims against TCI seek recovery for damages caused to Chiquita's product during TCI's performance of services under the Agreement. As Chiquita argues, "TCI [allegedly] breached the very contract under which it is simultaneously seeking payment."[40] The Court finds that Chiquita's counterclaims are therefore sufficiently "incidental to, or connected with" TCI's claims for unpaid services under the Agreement.

TCI argues, however, that Chiquita is not entitled to an offset because "Chiquita's alleged cargo claims are not prescribed under Louisiana law; they are time-barred under contract pursuant to a limitations provision."[41] TCI cites no law to support its argument. The Louisiana Supreme Court came to the opposite conclusion when considering a similar argument.[42] In *Taranto*, the parties to an insurance contract provided for a one-year period to bring suit under the policy.[43] The defendant in *Taranto* argued that the one year period in the insurance policy was a contractual limitation and not a liberative prescriptive period subject to the procedural rules governing prescription.[44] The Louisiana Supreme Court concluded that such a "position is flawed" because "although parties to [a contract] may . . . limit the prescriptive period to one year, they may not, as a matter of law . . . divest said time limitations of their prescriptive nature."[45] The Louisiana Supreme Court ultimately held that the one-year period agreed upon by the parties in the insurance policy was

---

[39] Doc. 1-2 at 4, ¶ 20. TCI's claims also include a claim for suit on open account, unjust enrichment, and promissory estoppel and/or detrimental reliance. *See id.* at 3–5.

[40] Doc. 28 at 9–10.

[41] Doc. 30 at 13.

[42] *Taranto*, 62 So. 2d at 732.

[43] *Id*. at 724.

[44] *Id*. at 732.

[45] *Id*.

subject to the procedural rules governing prescription.[46] Likewise, this Court sees no reason to hold that the limitations period in the Agreement is immune from the procedural rules governing prescription, such as the right to raise a prescribed claim to offset a main demand.

Accordingly, the Court holds that, to the extent that the six prescribed claims of cargo damage resulted from TCI's transloading services, they may nevertheless be used as a defense to offset TCI's main demand. To the extent that the six claims of cargo damage resulted from TCI's drayage services, however, they are not prescribed and may stand alone as an independent counterclaim. The Court must now address the effect of the 90-day notice requirement on each of the six claims of cargo damage.

## IV.   Effect of 90-Day Notice Provision in Appendix A

As earlier explained, Appendix A of the Agreement applies to claims for damages that emanate from TCI's transloading (and warehousing) services. Because "[c]ontracts have the effect of law for the parties," the 90-day notice provision contained in Appendix A has the full force of the law between the parties.[47] In other words, because the parties agreed that such claims are only permissible if the requisite notice is given, the Court must enforce that provision and prohibit any counterclaims by Chiquita that did not comply with the 90-day notice provision.[48] Here, the notice requirement provides:

> (a) Claims by the depositor and all other persons must be presented *in writing* to the warehouse within a reasonable time and in no event longer than either 90 days after delivery of the goods by the warehouseman or 90 days after depositor of record or the last known holder of a negotiable warehouse receipt is notified

---

[46] *Id.*

[47] LA. CIV. CODE ANN. art. 1983.

[48] *Sasol Wax Americas, Inc.*, 2008 WL 2067007, at *2–3 (holding that the agreed-upon 60-day notice provision in a contract must be enforced and that failure to satisfy the notice provision precluded recovery).

by the warehouseman that loss or injury to part or all of the goods
has occurred, whichever time is shorter.[49]

Accordingly, for Chiquita's six claims of cargo damage to be viable, Chiquita
must have provided TCI written notice of each claim within 90 days of
delivery of the goods.[50]

The six instances of cargo damage occurred on February 5, 2016; March
4, 2016; May 5, 2016; May 20, 2016; June 17, 2016; and June 23, 2016.
Written notice was provided by Chiquita to TCI regarding these instances of
damage in an email dated July 20, 2016. TCI argues that this email does not
sufficiently provide the requisite notice because it lacks a dollar amount for
damages. The Court finds, however, that Appendix A does not require such a
stringent standard to satisfy the notice requirement. Rather, Appendix A only
requires written notice of a claim within 90 days of delivery of the goods; it
does not contain any more specific actions that Chiquita must take to satisfy
the notice provision.

This notice was provided to TCI within 90 days of all but the first two
instances of cargo damage—February 5, 2016 and March 4, 2016. Chiquita
asserts that it met with TCI about the first two instances of cargo damage
and had communications with it regarding the damage. However, Chiquita
presents this Court with no evidence of timely *written notice* to TCI of the first
two instances of damage.[51] Accordingly, this Court finds that the requisite
notice was only given for the May 5, 2016; May 20, 2016; June 17, 2016; and
June 23, 2016 claims.

---

[49] Doc. 27-6 at 8 (emphasis added).

[50] This assumes that the cargo damage resulted from TCI's transloading services. If the
damage resulted from TCI's drayage services, then the 90-day notice requirement is
inapplicable.

[51] The Court is presented with a March 7, 2016 email discussing the March 4, 2016 incident
of cargo damage. *See* Doc. 25-12 at 2. It appears, however, that this email was an internal
Chiquita email and that it was never sent to a representative for TCI.

Chiquita argues that the February 5, 2016 and March 4, 2016 claims may nevertheless be used as an offset to TCI's main demand, noting that a prescribed obligation may be used as a defense to offset the main demand. While this is true, prescription is a wholly different bar to relief than an agreed-upon notice requirement. The law expressly provides for *prescribed* claims to be used as an offset to the main demand, but there is no provision in the law that makes a similar exception for other, mutually agreed-upon procedural bars to relief—and Chiquita provides this Court with none.

In sum, this Court holds that Chiquita failed to satisfy the notice requirement for the February 5, 2016 and March 4, 2016 claims for cargo damage. If these claims emanate from TCI's transloading services, then the failure to provide timely written notice of these claims presents a bar to relief, and these claims must be dismissed. If, however, these claims emanate from TCI's drayage services, then Appendix A does not apply, and these claims are independently viable. Likewise, if the May 5, 2016; May 20, 2016; June 17, 2016; and June 23, 2016 claims emanate from TCI's drayage services, then Appendix A does not apply, and these claims are independently viable. If these four claims emanate from TCI's transloading services, however, then they may be used only to offset TCI's main demand.

## CONCLUSION

For the foregoing reasons, TCI's Motion for Partial Summary Judgment (Doc. 27) is **GRANTED IN PART**, and Chiquita's Motion for Summary Judgment on the Inapplicability of the 90-Day Notice Provision (Doc. 25) is **GRANTED IN PART**.

To the extent that Chiquita's cargo damage counterclaims implicate TCI's drayage services, the claims are independently viable and withstand

summary judgment. To the extent that Chiquita's claims implicate TCI's transloading services, the February and March claims are not viable and will be dismissed, and the remaining four claims of cargo damage are viable only to offset TCI's main demand.

New Orleans, Louisiana this 24th day of April, 2020.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**